## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LAKITHA BELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Civil Action No. 07-S-650-NE** |
| | ) | |
| **LIFESOUTH COMMUNITY** | ) | |
| **BLOOD CENTERS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lakitha Bell, asserts claims against her former employer, LifeSouth

Community Blood Centers, Inc. ("LifeSouth"), under 42 U.S.C. § 1981 and Title VII

of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000 *et seq.*,

for discrimination on the basis of her race, color, and pregnancy, wrongful

termination, and retaliation. She also asserts a supplemental state law claim for

negligent and/or wanton hiring, training, supervision, and retention. *See* 28 U.S.C.

§ 1367.[1] The case is before the court on the following motions: defendant's motion

for summary judgment;[2] defendant's motion to strike Exhibit 17 of plaintiff's

evidentiary submission;[3] and plaintiff's motion to strike the supplemental affidavit

---

[1] *See* doc. no. 1 (Complaint).
[2] Doc. no. 17.
[3] Doc. no. 30.

of Mike Crowe.[4]  Upon consideration of these motions, the parties' briefs, and the

evidentiary submissions, the court concludes that defendant's motion for summary

judgment is due to be granted.  Defendant's motion to strike will be denied as moot,

and plaintiff's motion to strike will be denied.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should

be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he

plain language of Rule 56(c) mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence
> and make all reasonable inferences in favor of the party opposing
> summary judgment.
>
> The mere existence of some factual dispute will not defeat
> summary judgment unless that factual dispute is material to an issue
> affecting the outcome of the case.  The relevant rules of substantive law
> dictate the materiality of a disputed fact.  A genuine issue of material

---

[4]Doc. no. 36.

fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled).

## II. SUMMARY OF FACTS

Defendant, LifeSouth Community Blood Centers, Inc. ("LifeSouth"), is a system of non-profit, volunteer, blood centers that provides blood components and services to medical facilities in Alabama, Florida, and Georgia.[5]  Plaintiff, Lakitha Bell, an African-American female, began working as a Donor Services Specialist at LifeSouth's North Alabama branch in Huntsville, Alabama, on June 20, 2005.[6]  As a Donor Services Specialist, plaintiff served as a full-time hourly employee, meaning that she was required to "routinely work 80 hours in a [two-week] pay period."[7]  She remained in that position throughout her employment with LifeSouth.[8]

Plaintiff's immediate supervisor at LifeSouth was Mack Willoughby, a Caucasian Donor Services Supervisor.  Mr. Willoughby's immediate supervisor was

---

[5]Doc. no. 18 (defendant's evidentiary submission), Exhibit 1 (Affidavit of Mike Crowe), at ¶ 2.

[6]Defendant's evidentiary submission, Exhibit 2 (Deposition of Lakitha Bell), at 63-65.

[7]Defendant's evidentiary submission, Exhibit 6 (LifeSouth Employee Handbook), at 2-1 & 2-2.  *See also* Bell Deposition, at 65.

[8]Bell Deposition, at 186.

Netosha Twymon, an African-American Donor Services Manager.[9] Ms. Twymon's immediate supervisor was Gennifer Stokes, an African-American Branch Director.[10] Ms. Stokes' immediate supervisor was Jammye Schwartz, a Caucasian who became the District Director over LifeSouth's North Alabama region in March of 2006.[11] Beverly Hargrove, an African-American, served as LifeSouth's District Administrative Services Coordinator during plaintiff's employment. Ms. Hargrove's responsibility was to handle administrative functions at LifeSouth's North Alabama branch; she did not have direct supervisory authority over plaintiff.[12] Finally, Mike Crowe, a Caucasian, served as LifeSouth's Director of Human Resources during plaintiff's employment.[13]

LifeSouth has a Family and Medical Leave Policy that incorporates the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA").[14] LifeSouth's Family and Medical Leave Policy states that it "gives certain rights to an employee who has worked for the blood center for at least 12 months in the past year and who

---

[9]Bell Deposition, at 111; Crowe Affidavit, at ¶ 5.

[10]Crowe Affidavit, at ¶ 5.

[11]Defendant's evidentiary submission, Exhibit 7 (LifeSouth's responses to plaintiff's interrogatories"), at ¶ 3.

[12]Bell Deposition, at 86-87, 169.

[13]Crowe Affidavit, at ¶ 4.

[14]*See* LifeSouth Employee Handbook, at 2-7; Bell Deposition, at 93-96.

has worked at least 1,250 hours in the preceding 12 months."[15]  Plaintiff was not employed by LifeSouth for 12 months, or for 1,250 hours within a 12-month period. She consequently acknowledges that LifeSouth's Family and Medical Leave Policy never applied to her.[16]

LifeSouth also has a "Paid Time Off" policy ("PTO") that provides employees "with hours away from work with pay.  PTO hours can be used for vacation, personal time, illness, bereavement leave, or time off to care for dependents."[17]  The Employee Handbook directs employees to make requests for PTO by completing a Request for Employee Leave form and forwarding it to the appropriate supervisor.  Requests for leave of four weeks or more must be forwarded to LifeSouth's CEO for approval.[18] Employees should "request PTO in a timely fashion, preferably at least a week in advance of the requested time."[19]  The following policies govern how an employee's accrued PTO hours can be used:

> Should a non-exempt employee work more than 40 hours in one week of the pay period, the employee will be paid overtime for hours in excess of 40.  An employee cannot use PTO hours to bring his/her hours worked above 40 hours in a pay week.

---

[15]LifeSouth Employee Handbook, at 2-7.

[16]Bell Deposition, at 96-97.

[17]LifeSouth Employee Handbook, at 2-2.

[18]*Id.* at 2-3. *See also* Bell Deposition, at 103-04.

[19]LifeSouth Employee Handbook, at 2-3.

An employee must work a minimum of 80 hours in the two-week pay period; otherwise the employee's PTO hours will be used to bring the employee up to 80 hours.  If an employee works less than 80 hours in the pay period and he or she does not have enough PTO hours to bring him or her up to 80 hours, the employee will not accrue PTO for the pay period.[20]

The LifeSouth Manager's Handbook, which "explains management responsibilities in regard to employee leave," reiterates that employees are expected to request PTO leave at least seven days in advance by submitting a Request for Employee Leave form, and that the CEO must approve requests for leave of four weeks or more.[21]  The Manager's Handbook further states that,

[i]n addition to accessing PTO hours for employee leave, LifeSouth will automatically use an hourly employee's PTO hours when the employee works less in a pay period than his/her job classification requires (80 hours).  These hours are deducted from the employee's PTO bank by the Accounting Department.  If an employee has to have his or her hours brought up to 80 using PTO hours for 4 successive pay periods or in an established pattern, the employee may be subject to reclassification.[22]

Similarly, the Employee Handbook states that "[h]ourly full-time employees who need to have their hours brought up using PTO hours on a routine basis can be subject to

---

[20]*Id.* at 2-3, 2-4.

[21]Doc. no. 22 (plaintiff's evidentiary submission), Exhibit 20 (LifeSouth Manager's Handbook), at 8-1.

[22]*Id.*

6

review by upper management.  These employees can be subject to reclassification (as part-time employees) or termination."[23]

Finally, the Manager's Handbook states the following with regard to leaves of absence:

> Employees can request a leave of absence through their supervisor. All requests for leave of absences must be documented (in memo or letter form) and routed to the CEO for approval.  Once approved, the request will be forwarded to the HR Department and HR will determine if benefits can be maintained, including health insurance.[24]

On approximately December 22, 2005, plaintiff discovered she was pregnant, and soon thereafter, she informed Twymon and Hargrove.[25]  Because of her pregnancy, plaintiff's doctor limited her to working 30 hours a week, and plaintiff provided LifeSouth with a copy of the doctor's note to that effect.[26]  Plaintiff did not immediately begin working a reduced schedule, however.  LifeSouth payroll records indicate that, between December of 2005 and March of 2006, plaintiff worked a full eighty hours some pay periods, she worked overtime some pay periods, and she used PTO hours during three pay periods.[27]

---

[23]Employee Handbook, at 2-2.

[24]Manager's Handbook, at 4-30.

[25]Bell Deposition, at 69, 115, 129-32.

[26]*Id.* at 158.

[27]Plaintiff's evidentiary submission, at Exhibit 5 (payroll records).

In February or March of 2006, plaintiff asked Hargrove when would be a good time for her to take maternity leave, and when she would be able to return to work from leave.  Hargrove told plaintiff it didn't matter when she took leave, because she wouldn't be able to return to work.[28]  When plaintiff asked Hargrove to explain that comment, Hargrove refused to do so.[29]  Hargrove also refused to explain why other employees were allowed to return from leave when plaintiff was not.  Instead, Hargrove explained that she could not discuss other employees with plaintiff.[30]  Plaintiff complained to Twymon about Hargrove's comments, and sometime during March of 2006, plaintiff met with Twymon, Stokes, Hargrove, Schwartz, and Willoughby about the comments.[31]  Plaintiff told Schwartz that she "might as well quit" if she was going to be fired, and Schwartz told plaintiff she shouldn't quit because she could reapply for her job after her leave period was over.[32]

LifeSouth terminated plaintiff's employment on March 24, 2006.  The Notice of Official Reprimand effecting plaintiff's termination stated:

> Lakitha Bell has not been with LifeSouth for 12 months or worked at least 1250 hours in the preceding 12 months.  As a result, she is not eligible for the Family or Medical Leave program.  Lakitha's medical

---

[28]Bell Deposition, at 70-72.

[29]*Id.* at 72.

[30]*Id.* at 155-56.

[31]*Id.* at 81-82, 146-47.

[32]*Id.* at 149-50.

doctor has requested that she works [sic] no more than 30 hours per week, which is less than the 40 hours required for a LifeSouth employee to be considered as full-time. The Donor Services department in the NALA Region is not allotted any positions. In order to meet the request of Lakitha's medical doctor, she must work less than the 40 hours required of full-time employees. Due to the circumstances mentioned above, I recommend that her employment with LifeSouth is terminated today, March 24, 2006.[33]

The Notice was signed by both Stokes and Hargrove,[34] but Stokes and Hargrove informed plaintiff that Mike Crowe and Bill Gair (Lifesouth's CEO) had made the decision to terminate her.[35] Crowe testified that he decided to terminate plaintiff's employment based on her inability to work 40 hours per week and her ineligibility for leave or reduced hours under LifeSouth's Family and Medical Leave policy.[36] Plaintiff never reapplied for her position with LifeSouth.[37]

LifeSouth hired Robin Stephenson, a Caucasian, on January 3, 2005, as a part-time Donor Services Specialist at the North Alabama branch.[38] Ms. Stephenson was reclassified as a full-time employee three weeks later, on January 24, 2005.[39] Even during the three-week period Ms. Stephenson was classified as part-time, she never

---

[33]Plaintiff's evidentiary submission, Exhibit 4 (plaintiff's personnel file), at document bearing Bates Stamp No. ID00061.

[34]*Id.*

[35]Bell Deposition, at 197-98.

[36]Crowe Affidavit, at ¶ 6.

[37]Bell Deposition, at 151.

[38]Crowe Affidavit, at ¶ 10.

[39]*Id.*

regularly worked part-time hours.  Instead, Ms. Stephenson's payroll records indicate that she was not scheduled to work less than full-time hours during any week between January 3 and January 24, 2005.[40]  LifeSouth did not employ any part-time Donor Services Specialists — or any other part-time employees — during plaintiff's employment,[41] and it has not had any part-time employees at all since Ms. Stephenson.[42]  Plaintiff testified that she was not aware of any part-time schedules available for any position during her employment with LifeSouth.[43]

Jessica Williams, a Caucasian female, and Nicole Hardy, an African-American female, both were hired by LifeSouth as Donor Services Specialists on May 23, 2005.[44]  Both Williams and Hardy became pregnant.  In approximately November of 2005, without consulting anyone in LifeSouth's corporate Human Resources department, Hargrove informed both Williams and Hardy that they could take maternity leave.  Hargrove's decision was in error, because neither Hardy nor Williams qualified for leave under LifeSouth's Family and Medical Leave policy, and LifeSouth did not have a maternity leave policy outside its Family and Medical Leave

---

[40]*Id.* at ¶ 11.

[41]*Id.* at ¶ 9.

[42]*Id.* at ¶ 10.

[43]Bell Deposition, at 182.

[44]Plaintiff's evidentiary submission, Exhibit 6 (personnel file of Jessica Williams), at document bearing Bates Stamp No. RFP Docs 02086; Exhibit 8 (personnel file of Nicole Hardy), at document bearing Bates Stamp No. RFP Docs 04963.

policy.[45]  Crowe discovered Hargrove's mistake in December of 2005, after Hargrove had already informed Hardy and Williams they could take leave for their pregnancies. Because Hargrove had already committed the error, LifeSouth decided to allow Hardy and Williams to take the leave, even though they did not qualify under the Family and Medical Leave policy, provided that Hardy and Williams agreed to repay the benefits they had received during their respective leave periods.[46]

Ms. Williams was off work from approximately November 12, 2005, to approximately January 2, 2006.  She returned to work on approximately January 3, 2006.[47]  Williams testified that she was never informed that she would be required to repay any benefits while she was out of work.[48]  Instead, LifeSouth informed Williams in mid-January of 2006 that she would have to repay the portion of benefits that had been paid by LifeSouth during her leave period.[49]  Williams had already returned to work at that time, so LifeSouth recovered Williams' benefits through deductions from

---

[45]Crowe Affidavit, at ¶ 12.

[46]*Id.* at ¶ 15.

[47]Doc. no. 31 (defendant's supplemental evidentiary submission), Exhibit 1 (Supplemental Affidavit of Mike Crowe), at ¶ 6; plaintiff's evidentiary submission, Exhibit 8, at document bearing Bates Stamp no. RFP Docs 05040.

[48]Plaintiff's evidentiary submission, Exhibit 1 (Affidavit of Jessica Williams Davis), at ¶ 6.

[49]Supplemental Crowe Affidavit, at ¶ 7.

her paycheck.[50]   Because Williams repaid her benefits after she returned to work,
Lifesouth decided to retain her as an employee.[51]

Hardy went on maternity leave in December of 2005, and she was scheduled to
return in February of 2006.[52]  As it had done with Williams, LifeSouth informed Hardy
in mid-January of 2006 that, before she would be allowed to return to work, she would
have to repay the portion of benefits that had been paid by LifeSouth during her leave
period.[53]   Because Hardy had not returned to work (and consequently was not
receiving a paycheck), LifeSouth could not recover her benefits through payroll
deductions at that time.[54]  Hardy testified that she did not understand what she needed
to do in order to pay back her benefits, and when she attempted to consult with
Hargrove about the issue, she did not get any guidance.[55]  Hardy did not pay back any
of her benefits, and her employment was terminated before she returned from leave.
Hardy stated that LifeSouth never gave her the option to return to work and have her
benefits repaid through payroll deductions.[56]  Hardy's termination notice states:

---

[50]*Id.*

[51]*Id.* at ¶¶ 15-16.

[52]Plaintiff's evidentiary submission, Exhibit 2 (Affidavit of Nicole Hardy), at ¶ 9.

[53]Supplemental Crowe Affidavit, at ¶ 7; Hardy Affidavit, at ¶ 9.

[54]Supplemental Crowe Affidavit, at ¶ 7.

[55]Hardy Affidavit, at ¶ 9.

[56]*Id.* at ¶ 10.

On or about January 17, 2006, Nicole was given information about FMLA.  It was explained to her that she would need to pay a certain amount of money to keep her LifeSouth benefits, because she was not eligible for FMLA.  Nicole stated that she did not need our benefits because she had Medicaid.  I informed Mike Crowe, and he, myself along with Maria Silva gave her a call.  Mike explained to Nicole that if she did not pay to keep her benefit[s] with Lifesouth by January 31, 2006, she would be terminated.  Nicole was advised by Mike to contact Beverly Hargrove by January 31, 2006 to inform her intentions.[sic]  Nicole never contacted anyone LifeSouth.[sic]  As a result, Nicole was terminated on January 31, 2006.[57]

The termination notice was signed on February 6, 2006 by Gennifer Stokes.

Other than Williams and Hardy, no employees of any race or any pregnancy status were allowed to take leave without qualifying under LifeSouth's Family and Medical Leave policy.[58]  In fact, LifeSouth terminated a Grant Thompson, a Caucasian male Donor Recruiter, in December 2005, because he suffered from a non-pregnancy-related medical condition requiring extended leave, but he did not qualify for coverage under LifeSouth's Family and Medical Leave policy.  LifeSouth also terminated Lisa Herring, a Caucasian female Donor Services Specialist, in February 2006, because she suffered from a non-pregnancy-related medical condition requiring leave, but she did not qualify for Family and Medical leave.  Finally, LifeSouth terminated David Ryan, a Caucasian male Facility Services Technician, in June 2006 because he did not

---

[57]Crowe Affidavit, at Exhibit H.

[58]Crowe Affidavit, at ¶ 17.  *See also* Bell Deposition, at 181-83.

qualify for leave but needed to take leave for a non-pregnancy-related medical condition.[59]

Prior to her termination, but on a date that is not specified in the record, plaintiff complained to Twymon and Hargrove that she did not think she was being treated fairly with regard to taking leave and not being able to return to work. Specifically, plaintiff complained that she was not allowed to return to work after maternity leave, while Jessica Williams was allowed to return to work. Plaintiff testified, however, that she did not communicate to Twymon, Hargrove, or anyone else at LifeSouth that she and Williams had been treated differently because of race.[60]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 7, 2006.[61] She checked boxes on the charge form for discrimination based upon race, color, and pregnancy. She did not check the box for retaliation. Plaintiff's charge stated the following allegations:

> My name is Lakitha Bell, and I am a twenty-three year old black African American female. On or around June 20, 2005, I was hired by LifeSouth Community Blood Center, Inc. (hereinafter "LifeSouth") as a full time Donor Services Specialist (phlebotomist) for $10.00 per hour. I worked a minimum of 40 hours per week, and averaged 10 to 15 hours of overtime every week at time and a half. I had no performance issues

---

[59]Crowe Affidavit, at ¶ 8.

[60]Bell Deposition, at 70-71, 193-94.

[61]*See* Exhibit to Complaint (doc. no. 1).

during my employment.  In fact, on or around the pay period ending on March 11, 2005, I received a raise to $10.61 per hour.

On or around December 22, 2005, I told my employer that I was pregnant.  Beginning in approximately February 2006, the human resources person, Beverly Hargrove, started asking me every week when I would be taking maternity leave so she could start the paperwork and calculate the numbers.  I finally told her that I would probably go on maternity leave around May 1, 2006.  On or around March 16, 2006, my doctor restricted me to 30 hours of work per week.  I turned the note into my supervisor, pursuant to company policy.  On or around March 20, I asked Beverly Hargrove if she had worked on the paperwork to determine what would be the best day for me to start my leave.  She told me that it didn't matter when I took off because I wouldn't have a job when I got back.

I immediately complained to my supervisor, Natasha Twyman, about Hargrove's comment, and that I felt it was discriminatory.  A meeting was held to discuss my concerns.  Present were Natasha Twyman, Beverly Hargrove, and District Director Jamie Schwartz. I was told that there was not a part-time position for me and that I could not be accommodated with a 30-hour work week per my doctor's orders.  I was further told that because I was ineligible for Family Medical Leave (FMLA), that they would not hold my full-time position for me when I did take leave.  However, according to the employee handbook, employees can take intermittent leave or work-reduced hours due to a serious health condition of the employee . . . if a physician states that it is medically necessary.  I could also use accrued Paid Time Off (PTO) and Reserved Sick Hours (RSH) to take time off when I needed to.

I worked my regular, full-time hours that week, and on Friday, March 24, 2006, I was called into the office and Beverly Hargrove terminated me because of my pregnancy.  The reasons given were that I was ineligible for FMLA and there were no part-time positions available.

I complained immediately to my supervisor, Natasha Twyman. She was not able to do anything about my complaint because she was terminated on Monday, March 27, 2006 for allegedly mishandling my

paperwork.  I then complained to Jennifer Stokes, the Branch Director, and she told me that Mike Crow from Human Resources and Bill Gair, the CEO, told her to let me go, and there was nothing she would do about it.

I am aware of another black female employee, Nicole Hardy, who took off in December, delivered her baby in January, and was called at home and told not to come back to work.  In contrast to myself and Nicole hardy, a white female employee, Jessica (last name unknown), wen ton leave and had her baby on November 18, 2005, and returned to work on or around the first of the year.  Jessica had not been employed a year and was also not eligible for FMLA.  No reason was given to me to justify why the white pregnant employee was allowed to return after she had her baby, while myself and another pregnant black female were both fired and not allowed to return after having our babies.  Furthermore, I am aware of a white female employee, Robin Stevenson, who was hired in as part-time.  No reason was given to me why I could not work reduced hours.[62]

## III.  DISCUSSION

## A.    Abandonment of Hostile Work Environment Claim

At the summary judgment stage, plaintiff has effectively abandoned her claim for a hostile work environment.  Plaintiff offered no response to defendant's well-supported arguments that summary judgment should be granted on that claim.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman,* 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union*

---

[62]*Id.*

*No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding

that a district court can "properly treat as abandoned a claim alleged in the complaint

but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard*

*A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed

in opposition to a motion for summary judgment is to be treated by the district court

as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations

and internal quotation marks omitted).

## B.     Race- and Pregnancy-Based Discrimination and Termination Claims

Plaintiff claims that she was subjected to disparate treatment on the basis of her

race and pregnancy when LifeSouth denied her leave, refused to allow her to return

to work after the birth of her child, denied her a part-time position, failed to

accommodate her thirty-hour-per-week work limitation, and terminated her

employment. Plaintiff does not claim to have direct evidence of a race- or pregnancy-

based discriminatory animus. Thus, she must prove her claims with circumstantial

evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination. To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action.  If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that defendant's proffered reason is merely a pretext for unlawful discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

To establish a *prima facie* case of discrimination in the termination of plaintiff's employment on the basis of her race, color, or pregnancy under Title VII, as amended by the Pregnancy Discrimination Act ("PDA"), plaintiff must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) the employer treated similarly situated employees outside of her protected class more favorably, and (4) she was qualified to perform the duties of her job.  *See, e.g., Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).  *See also Armstrong v. Flowers Hospital, Inc.,* 33 F.3d 1308, 1314 (11th Cir. 1994) (applying the elements of a prima face claim of gender discrimination to the plaintiff's claim of pregnancy

18

discrimination); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (reciting the same elements with regard to a claim for race-based discrimination).[63]

It is undisputed that, as a pregnant African-American female, plaintiff is a member of a protected class.  It also is undisputed that plaintiff suffered an adverse employment action.  *See Llampallas v. Mini-Circuits Lab, Inc.,* 163 F.3d 1236, 1246 n.18 (11th Cir. 1998) (stating that termination is the "classic and ultimate 'tangible employment action'").

Defendant argues, however, that, at the time of her termination, plaintiff was no longer qualified to serve as a Donor Services Specialist.  Defendant relies upon the Eleventh Circuit's decision in *Spivey v. Beverly Enterprises, Inc.,* 196 F.3d 1309 (11th Cir. 1999).  There, Spivey worked as a certified nurse's assistant in a rehabilitation center, and her primary responsibilities included lifting and repositioning patients, assisting with patient baths and meals, and providing general patient care.  *Id.* at 1311.  Spivey discovered she was pregnant and

> developed concerns that lifting a patient on her assigned hall who weighed almost 250 pounds could cause harm to her unborn child.  As a result, she requested assistance in lifting this patient.  She was told by [her employer] to obtain a doctor's verification of the restriction and she

---

[63]The elements of proof for plaintiff's claims of discrimination on the basis of her race are the same under both Title VII and § 1981.  *See, e.g., Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

consequently obtained a restriction from her obstetrician which imposed
a lifting limitation of 25 pounds.

Upon receipt of the medical restriction, [Spivey's employer]
notified [her] that she would not be provided with an accommodation due
to the company's modified duty policy. [The employer's] policy stated
that employees were excused from meeting their job responsibilities only
if they qualified for modified duty, which was available exclusively to
employees who suffered from work-related injuries. Under this policy,
[Spivey] consequently attempted to have the lifting restriction removed
by her obstetrician. The doctor, however, refused this request. As a
result of the medical restriction that precluded her from lifting more than
25 pounds, [Spivey] was terminated.

*Id.* at 1311-12. Spivey claimed that her termination was the result of pregnancy-based

discrimination, and her employer moved for summary judgment, arguing that she

could not satisfy her *prima facie* case because she was not qualified to perform the

duties of her job.  *Id.* at 1312.  Spivey did not dispute that her lifting restriction

prevented her from being able to perform all the responsibilities of her position.  She

did argue, however, that she should have been granted modified duty because she was

"as capable of performing the duties required of a modified duty assignment as non-

pregnant employees who were injured on the job."  *Id.*  The Eleventh Circuit

disagreed, holding that the employer was not obligated to extend the modified duty

accommodation to pregnant employees because the Pregnancy Discrimination Act

"does not require that employers give preferential treatment to pregnant employees."

*Id.* (citing *Lang v. Star Herald,* 107 F.3d 1308, 1312 (8th Cir. 1997); *Garcia v.*

20

*Woman's Hospital of Texas,* 97 F.3d 810, 813 (5th Cir. 1996); *Troupe v. May Department Stores Co.,* 20 F.3d 734, 738 (7th Cir. 1994)).  The Eleventh Circuit consequently upheld the dismissal of Spivey's pregnancy-based discrimination claim. *Spivey,* 196 F.3d at 1314.

Defendant asserts that, like in *Spivey*, plaintiff's pregnancy prevented her from performing the qualifications of the Donor Services Specialist ("DSS") position.  More specifically, defendant asserts that plaintiff was not qualified because the DSS position required a full-time, forty-hour-per week work schedule, but plaintiff's doctor limited her to working thirty hours per week.  Plaintiff maintains, however, that *Spivey* is distinguishable because the lifting restrictions Spivey's doctor imposed interfered with an actual qualification for Spivey's job, whereas the thirty-hour-per-week work restriction imposed by plaintiff's doctor relates only to plaintiff's job *performance.* Plaintiff also points out that the job description for the DSS position does not state a requirement of working forty hours every week, and that the Manager's Handbook and Employee Handbook do not state that the inability to work forty hours a week is a terminable offense.

This court finds plaintiff's arguments unavailing.  There is nothing in *Spivey* to indicate that the Eleventh Circuit intended to limit its holding to cases involving employee lifting restrictions, or to cases in which an employee is unable to perform

a job function specifically listed in the job description.  To the contrary, the *Spivey* decision was based upon the underlying policy of encouraging equal treatment of pregnant and non-pregnant employees.  *See Spivey,* 196 F.3d at 1312 ("The PDA does not require that employers give preferential treatment to pregnant employees.").  The United States District Court for the Northern District of Georgia elaborated on that underlying policy in *Sermons v. Fleetwood Homes of Georgia,* 227 F. Supp. 2d 1368 (S.D. Ga. 2002), stating:

> The PDA does not require an employer to provide special accommodations to its employees.  Instead, the PDA only ensures that pregnant employees are given the same opportunities and benefits as non-pregnant employees who are similarly limited in their ability to work.  *Byrd v. Lakeshore Hospital,* 30 F.3d 1380, 1382 (11th Cir. 1994) ("It is today a settled principle that the PDA and Title VII are violated when pregnant employees are denied privileges afforded non-pregnant temporarily disabled employees."). If an employee's pregnancy actually prevents her from fulfilling the duties of her position, her employer is not obligated to give her preferential treatment.  *Spivey v. Beverly Enterprises, Inc.,* 196 F.3d 1309, 1312 (11th Cir. 1999) ("The PDA does not require that employers give preferential treatment to pregnant employees.").   In other words, her employer is not required to accommodate her if the employer would not accommodate non-pregnant employees in a comparable situation.  *Armstrong,* 33 F.3d at 1317 ("Statements in the legislative history make it clear that the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees.").

*Sermons,* 227 F. Supp. 2d at 1377.

Furthermore, the United States District Court for the Northern District of Florida has noted in an unpublished opinion that "'employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees.'" *McQueen v. Airtran Airways, Inc.,* No. 3:04-CV-00180-RS-EMT, 2005 WL 3591100, at *5 (N.D. Fla. Dec. 30, 2005) (quoting *Geier v. Medtronic, Inc.,* 99 F. 3d 238, 242 (7th Cir. 1996) (in turn quoting *Troupe v. May Dep't Stores Co.,* 20 F.3d 734, 738 (7th Cir. 1994))). The PDA does not require an employer

> to excuse pregnant employees from having to satisfy the *legitimate* requirements of their job. [To hold otherwise would be to] subsidiz[e] a class of workers, and the concept of disparate impact does not stretch that far . . . Nor would pregnant women, or women in general, benefit from such a stretch. Firms would be deterred from employing women of childbearing age if required to overlook the inability of a particular woman, because of . . . pregnancy, to do the work for which she had been hired.

*McQueen,* 2005 WL 3591100, at *5 (quoting *Dormeyer v. Comerica Bank-III,* 223 F.3d 579, 584 (7th Cir. 2000) (in turn citing *Troupe,* 20 F.3d at 738; *Urbano v. Continental Airlines, Inc.,* 138 F.3d 204, 208 (5th Cir. 1998); *Armstrong,* 33 F.3d at 1317))) (emphasis, bracketed alterations, and ellipses in *McQueen*).

In the present case, plaintiff does not dispute that, as a DSS, she was expected to work 40 hours a week, or 80 hours in a two-week pay period.[64] She also does not

---

[64]*See* doc. no. 19 (defendant's brief, Statement of Undisputed Facts), at ¶ 4 ("Mrs. Bell was a full-time hourly employee, meaning she was required to 'routinely work 80 hours in a pay period.'"); doc. no. 23 (plaintiff's brief, Response to Defendant's Statement of Facts) (providing no

dispute that her doctor restricted her from working more than 30 hours a week.  Under the reasoning set forth by the Eleventh Circuit in *Spivey*, defendant was not required to accommodate plaintiff's thirty-hour-per-week restriction any more than it would have to accommodate the same restriction for a non-pregnant employee.  Because plaintiff could not fulfill all of the requirements of her position, she cannot establish that she was qualified to perform the duties of her job at the time her employment was terminated.

Plaintiff cannot satisfy all elements of a prima facie case on her race and pregnancy discrimination claims.  Accordingly, summary judgment is due to be granted on those claims.

## C.    Retaliation

Plaintiff also alleges that she was "retaliated against for making a complaint of discrimination against manager, Beverly Hargorve."[65]

### 1.    Exhaustion of administrative remedies

Defendant first argues that plaintiff cannot pursue her retaliation claim because she failed to exhaust her administrative remedies on that claim.  A plaintiff must

---

response to defendant's Statement of Undisputed Fact #4); doc. no. 9 (Uniform Initial Order), at 17 ("*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*") (emphasis in original).

[65]Complaint, at ¶ 42.

satisfy a number of administrative prerequisites before filing a suit based upon Title VII, including a claim for retaliation.  Foremost among these is the requirement that a charge of discrimination be submitted to the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge."); *Stafford v. Muscogee County Board of Education*, 688 F.2d 1383, 1387 (11th Cir. 1982) ("In order to assert a claim of racial discrimination under Title VII, a claimant must file a complaint with the EEOC within 180 days after the alleged discriminatory practice occurred.").

Defendant argues that plaintiff's retaliation claim should be dismissed because she failed to allege retaliation during the EEOC proceedings.  Indeed, on the face of plaintiff's EEOC charge form, she checked boxes for discrimination based upon race, color, and pregnancy, but not retaliation.  The Eleventh Circuit has held, however, that a plaintiff's failure to mark the "retaliation box" on an EEOC charge form does not administratively bar a retaliation claim.  *Gregory v. Georgia Dept. of Human Resources,* 355 F.3d 1277, 1280 (11th Cir. 2004) ("[T]he district court did not err in finding that Dr. Gregory's retaliation claim was not administratively barred by her failure to mark the retaliation space on the EEOC template form."); *see also Houston*

*v. Army Fleet Services, L.L.C.,* 509 F. Supp. 2d 1033, 1042 (M.D. Ala. 2007) ("[A] charging party's failure to check the appropriate box on the EEOC charge of discrimination form indicating what he believes to be the basis for the discrimination (*i.e.,* race, color, sex, disability, retaliation, national origin, age, or religion) does not bar the plaintiff from litigating a claim so long as the factual allegations in the EEOC charge were sufficient.") (citations omitted).

Defendant also points out that the factual allegations in the body of plaintiff's EEOC charge allege discrimination on the basis of race and pregnancy, but not retaliation.  It is not necessary, however, that the charge explicitly mention the term "retaliation" in order for the administrative requirements to be satisfied.  Instead, "a 'plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Gregory,* 355 F.3d at 1280 (quoting *Alexander,* 207 F.3d at 1332, and citing *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 460 (5th Cir. 1970)).[66]  The proper inquiry is whether plaintiff's complaint "was like or related to, or grew out of, the allegations contained in her EEOC charge."  *Gregory,* 355 F.3d at 1280.

---

[66]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

This court concludes that, while plaintiff's EEOC charge did not specifically mention retaliation, her retaliation claim was like or related to the allegations of her charge, and her retaliation allegations could reasonably be expected to fall within the scope of the EEOC's investigation.  Plaintiff alleged in her charge that she complained to Natasha Twyman that Hargrove's comment — that she wouldn't have a job when she returned from leave — was discriminatory, and that she was terminated approximately four days later.  The EEOC, in investigating those allegations, could reasonably have formed a connection between plaintiff's complaints and her subsequent termination.  Indeed, plaintiff's situation is similar to that discussed by the Eleventh Circuit in *Gregory.*  There, the court stated:

> The proper inquiry here therefore is whether Dr. Gregory's complaint was like or related to, or grew out of, the allegations contained in her EEOC charge.  Dr. Gregory, without the aid of counsel, filed an EEOC charge *after* she was terminated.  The ultimate act that she complained about was that she was terminated.  At the point at which she filed the charge, she "believe[d]" that she was terminated because of her race and sex.  She set forth the relevant dates of discrimination in the charge, as well as the reasons why she believed she was terminated. Although not clear in the record, the EEOC presumably investigated, at least in some fashion, the possible reasons why Dr. Gregory was terminated, growing from her initial "belief" that it was because of her race and sex.  Indeed, there could be various permutations of non-legitimate reasons why an employee is ultimately terminated.  In Dr. Gregory's situation, for example, it could be that race and sex were the only reasons, as she initially believed, why she was terminated.  It could also be, however, that Dr. Gregory was terminated *in retaliation for*

having complained about Dr. Fuller's disparate treatment of her, *inter alia,* during physician scheduling and patient assignments. . . .

After a careful de novo reading of Dr. Gregory's EEOC charge prepared without the assistance of counsel, and under the liberal EEOC charge strictures of Sanchez, we hold that the district court did not err in finding that Dr. Gregory's retaliation claim was not administratively barred by her failure to mark the retaliation space on the EEOC template form. The facts alleged in her EEOC charge could have reasonably been extended to encompass a claim for retaliation because they were inextricably intertwined with her complaints of race and sex discrimination. That is, she stated facts from which a reasonable EEOC investigator could have concluded that what she had complained about is retaliation because of her complaints of Dr. Fuller's disparate treatment to the hospital's administration. Specifically, shortly after being subjected to certain allegedly discriminatory acts, she was terminated. An EEOC investigation of her race and sex discrimination complaints leading to her termination would have reasonably uncovered any evidence of retaliation.

*Gregory,* 355 F.3d at 1280 (citation omitted) (emphasis and bracketed alterations in original).

Based on the foregoing, the court concludes that plaintiff's retaliation claim is not barred for failure to exhaust administrative remedies. Accordingly, the court will proceed to consider the merits of the claim.

### 2.    Merits of retaliation claim

"Retaliation is a separate violation of Title VII."  *Gupta v. Florida Board of Regents,* 212 F.3d 571, 586 (11th Cir. 2000).  A plaintiff generally must prove three elements to establish a *prima facie* case of retaliation:  (1) she engaged in statutorily

protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.  *See, e.g., Shannon v. BellSouth Telecommunications, Inc*., 292 F.3d 712, 715 (11th Cir. 2002).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer  a legitimate reason for the adverse action . . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted).

There is no dispute that plaintiff suffered an adverse employment action. Defendant argues, however, that plaintiff still cannot support a *prima facie* case of retaliation because she has no evidence that she engaged in statutorily protected expression.  The Eleventh Circuit has held that a complaint of "[u]nfair treatment, absent discrimination based on race, sex, or national origin," does not constitute statutorily protected activity.  *Coutu v. Martin County Board of County Commissioners,* 47 F.3d 1068, 1074 (11th Cir. 1995).  In *Coutu,* the plaintiff filed a written grievance that "contained a conclusory allegation of racial discrimination, [but] her attorney waived this allegation at the grievance hearing."  *Id.* Furthermore,

29

during the grievance hearing, "Coutu made no allegation and offered no proof of race or national origin discrimination; she contended only that she worked hard and deserved a better rating than" she received. *Id.* The Eleventh Circuit concluded that, absent any allegations of discriminatory treatment, Coutu's grievance did not constitute statutorily protected expression. *Id.*

Similarly, in the present case, plaintiff complained to Twymon and Hargrove that she was not treated "fairly" when she was not allowed to return to work after maternity leave, while Jessica Williams was. Plaintiff acknowledged, however, that she did not communicate to Twymon, Hargrove, or anyone else at LifeSouth that she believed the differential treatment was based upon her race.[67] Therefore, plaintiff cannot be said to have complained about any racially discriminatory treatment. *See Birdyshaw v. Dillard's, Inc.,* No. 08-12824, 2009 WL 120060, at *6 (11th Cir. Jan. 28, 2009) (slip copy) (holding that, when the plaintiff acknowledged in her deposition that a letter she wrote to her employer did not inform the employer that her supervisor had engaged in gender discrimination, the letter did not constitute statutorily protected expression).

She also cannot be said to have complained of discrimination on the basis of pregnancy, because Jessica Williams, the employee plaintiff claims was treated *better*

---

[67]Bell Deposition, at 70-71, 193-94.

than she was treated, also was pregnant.  Because plaintiff did not complain to Twymon and Hargrove about any unfair treatment *as a result of discrimination*, she did not engage in statutorily protected expression under  Title VII.  Accordingly, plaintiff cannot establish a *prima facie* case of retaliation, and summary judgment is due to be granted on her retaliation claim.[68]

## D.    State Law Claims

The only remaining claim is plaintiff's state law claim for negligent and/or wanton hiring, training, supervision and retention.[69]   In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are supplemental to the federal claim.  *See* 28 U.S.C. § 1367(a).  The district court may decline to exercise supplemental jurisdiction when:

(1)    the claim raises a novel or complex issue of state law,

(2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)    *the district court has dismissed all claims over which it has original jurisdiction*, or

---

[68]Furthermore, plaintiff effectively conceded defendant's argument that her complaint of "unfair treatment" did not constitute statutorily protected expression.  In her brief, plaintiff argued only that an informal internal complaint can constitute statutorily protected expression, and that plaintiff is not required to prove that defendant actually committed any acts of discrimination in order to recover on a retaliation claim.  *See* doc. no. 19 (plaintiff's brief), at 33.  Plaintiff did not cite any case law authority, or point to any portions of the record, to support the proposition that her complaint of unfair treatment constituted statutorily protected expression.

[69]*See* Complaint, at Count Four.

31

(4)     in exceptional circumstances, there are other compelling reasons
        for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988).

Here, plaintiff's federal claims have been eliminated.  Accordingly, this court declines supplemental jurisdiction over the remaining state law claim, and exercises its discretion to dismiss that claim.

## IV.  CONCLUSION AND ORDER

In consideration of the foregoing, defendant's motion for summary judgment is GRANTED, and plaintiff's federal claims are DISMISSED with prejudice. Plaintiff's supplemental, state-law claim is dismissed without prejudice.  Defendant's motion to strike is DENIED as moot, and plaintiff's motion to strike is DENIED.[70] Costs incurred herein are taxed to plaintiff.  The clerk is directed to close this file.

DONE this 17th day of March, 2009.

_____

---

[70]As summary judgment is due to be granted on the merits of plaintiff's claims, the court need not consider defendant's after-acquired evidence defense.

United States District Judge